Migratory bird baiting case, Mr. Holdman finds himself in the unique position of being criminally convicted for doing precisely what the federal government told him and the public as a whole they should do to avoid criminal liability. In 1999, when the Fish and Wildlife Service amended the baiting rules, they specifically provided for non-waterfowl migratory birds a new rule that was purely objective, did not inquire into intent, said the field is not baited if the seed is scattered, quote, in accordance with official recommendations of state extension specialists of the Cooperative Extension Service of the U.S. Department of Agriculture. Is there any evidence that your client was aware of the Mississippi version of that? Your Honor, the twofold answer is yes there is. He references in his testimony, he doesn't say I specifically followed it, he references what the law will allow and some of his practices in aiming for the 120 pound per acre seed rate from the Mississippi regulations. So he addresses it indirectly, but I would say it really doesn't matter if he knew he did or not. The point of the objective test was if it is, it falls within the purview of a normal agricultural practice. I haven't seen any argument by you about reasonable reliance on the Mississippi one. I think it's a Louisiana word, lag nap. You found one that would be helpful, but I was wondering if he was arguing that I had this in my glove box in my car or in my truck all along. I think he references it, but I don't think this is a reliance issue, Your Honor. I think it's purely a statutory interpretation issue of if it's an objective standard within here. I haven't seen the whole document published, bound, whatever. In one of the exhibits, there's a map of the southeast region. Is that on this particular Mississippi state? It's not, Your Honor. The southeast is in the linked document that came from the government that they asked the court to consider. It was never put before the court. Although, we did question Dr. Reed, the government's expert, and familiar with extension services and recommendations, and ask him, does the southeast include Louisiana? He admitted that it did. No one really disputed that Louisiana is included in the southeast at trial. Also, there's a point that this is the government's ... Just to be clear, that map is not connected with the Mississippi extension service, Mississippi state? It is on some recommendations, not the ones that were admitted at trial. We had that issue in the government's appellee brief. They linked a different set, which was published two years later. That was not the initial one. Once Dr. Reed admitted that and said, hey, here's southeast. Southeast is obviously included in ... Louisiana's included in the southeast. No one ever disputed it from that point. We continued ticking right along. Again, it's the government's burden of proof. This is not an affirmative defense. It's the government's burden to prove that it didn't fall within an extension service regulation. If that's ambiguous, it was on the government to prove that it did not fall within the regulation, the recommendation. We have briefed this case extensively. By the time we were done, replies, we had reached the dormant commerce clause in a bird hunting case. I obviously don't want to get in that minutiae, but there's three particular overriding points that if you work through, it eliminates the three reasons Mr. Holdman was convicted. The three reasons were the magistrate judge's finding where she cited Fifth Circuit directives that the court or the government have ever identified that required it to be only Louisiana, and then found that even if the Mississippi State applied, she was going to require it to be covered with soil, even if that was not in the recommendation. Then we have an issue with the District Court on Appeal focusing on the solely exclusive agricultural purpose. The way we get rid of two of those is to start with the objective nature of the test. That's really the overriding issue, is that this is based solely on whether or not the scattering of the seed fit within extension recommendations. The government conceded that. That intent does not matter. The District Court went a different way and said, well, it's got to be solely agricultural. We briefed this. It was conceded. I don't want to belabor it, but there is a wrinkle there that's easy to overlook that I want to make sure is clear, is that the regulation makes a difference between migratory birds that are waterfowl and those that are not. It uses two very similar phrases, but have different meanings. If you're going to hunt waterfowl, cranes or coots, the seed has to be present pursuant to a normal agricultural planting. Planting is very similar to normal agricultural operation that applies to non-waterfowl birds. In the definition of normal agricultural planting, the crop has to be planted for the purpose of growing and harvesting a crop. For non-migratory birds, they use a different phrase that is just based solely on whether it follows the extension recommendations. For non-waterfowl, they have removed any intent to actually plant, which is why they tell us in their publication that we're not concerned with what you intend to do, even if you want it solely for wildlife. Just to make sure I'm looking at the right CFR, the one about migratory game birds is 2021I? That's correct, Your Honor. Which one are you referring to? It's 21I. One refers to migratory birds, including cranes, coots, and waterfowl, and if you go to two, you get the excluding, and that's the difference. The first one uses normal agricultural planting, harvesting, or post-harvest manipulation, which has a different meaning. The regulation specifically said for non-waterfowl, we're not concerned with what you intend to do. You don't even have to intend to grow a crop as long as it fits within the recommendations. There's no way to reconcile the district court's reading of it's got to be solely agricultural. It's writing in a restriction for waterfowls that the agency chose not to apply to non-waterfowl birds like doves. This objective standard also resolves the magistrate's judge's second point when the I would still find it baited because you didn't cover the seed. She thought it was common sense to cover the seed. That also conflicts with this objective standard. What they say in the final rule is that we're engaging on objective standard, deferring to the expertise, the subject matter experts who are the extension specialists. Well, obviously, if a court comes in and says, I know it requires XYZ to fit in the safe harbor, but I want you to add ABC, that defeats the whole point of having an objective safe harbor provision. It also goes against the purpose of relying on subject matter expertise of these ag experts because you're saying, I know better than you, PhD, who studies this, I want to require other things that you did not. That's particularly important here because it concerns top-sowing. She essentially imposed a pro se prohibition on top-sowing and the final rule talks about that. Their proposed rule had a ban on top-sowing, but they received a lot of comments. One of them was that it was a time-honored tradition of dove hunting. They mentioned that, and they chose not to. The agency specifically chose to allow it unless it was required by the extension recommendation. What that leaves us with is really what I consider the rub in this case. What it hangs on is the state extension specialist of whether that's restricted only to Louisiana as the magistrate court found. We got a lot into definitions, history, and background, but I really want to pause before that to start what we too often overlook when we overthink these things, which is a plain reading of the text. The text says, specialist of the extension service of the cooperative extension service  Dr. Reed testified that is exactly who issued the recommendations we put into evidence. It fits hand-in-glove verbatim into what was provided. The only way to convict him with this interpretation is to add a restriction that was not put in by the drafters. That's a problem with any statute, any rule, but particularly in the context of this specific fish and wildlife rule. How far would you limit or how narrowly would you limit where you could get some other state's extension service guidance that would fit what happened? As a practical matter, we talked about this at trial and in brief, is it would actually have to apply. Of course, I'm not saying if there's a Maryland regulation for Maryland, that facially doesn't apply. What does limit your approach to this? Exactly what the fish and wildlife service said, which is to defer to the experts, the ag experts. We trust them to say, hey, you have a purpose. You want to grow it for deer or dove, we can tell you what crop you need, what variety, how to fertilize it, if you need to cover it, when you need to plant it. I think we can also trust them to say where their recommendations apply. They're the ones who do the research. They're the ones who develop them. I think that's exactly what the rule does. It defers to them to tell us. What you are overlooking, it seems to me, the fact that these seeds were put out in enormous quantities, only in the area that there was this useless wire overhead and the blind, if you will, and that were not covered, were not turned under. The only thing that it could possibly be was baiting. And that's what the regulation tells you. It doesn't matter if you intended to bait it. That's what the government conceded in their brief below. It doesn't matter if you plant it with the intent to attract migratory birds. The only question is whether or not it's done pursuant to the recommendations. How would it be that it was uncovered, not turned under, left in these huge quantities relatively, and not turned under? Well, Your Honor, I would have to take that and compare that to the recommendations. And the recommendations that we put into evidence, Exhibit 5, excuse me, I think it was Exhibit 8, they provided two choices. They provided a drilled, covered, or a broadcast. They did not require broadcast seed to be covered. So if the recommendations didn't require it, then that does not, can't render it baited. As far as the seed rate, we stipulated at trial that the seed rate was between 111 and 118 pounds per acre, which is below the 120 that's recommended for broadcast planting on the Mississippi State recommendations. It's really, we view it, what the Fish and Wildlife Service said was take the recommendation and see if it applies. And nobody pointed out anywhere at trial or here any part of those Mississippi State recommendations that Mr. Holdman didn't follow, that there's not a single part of his planning that conflicts anywhere with what Mississippi State published and we put into evidence. But I still don't understand how the Mississippi rules apply here. Because the ag experts who developed them found that they were applicable there. And I think that's really the rub of the case and the implications beyond this. When the rule says we're going to defer to them and then we as a court or an attorney or the government can come in and say I want to apply differently or restrict it to less states or expand it to prohibit things like top sowing that it allows, there's a rule of law issue. Just so I'm clear in my mind, the MSU recommendation applies to this area by its own terms? It does, Your Honor. What about the LSU recommendation? Does it also apply to this area by its own terms? It would. So there's overlapping and conflicting recommendations? There are, Your Honor. And I think the Fish and Wildlife Service anticipated that. They noted that they can vary. Some may be oral. Some may be written. They can vary from state to state, region to region. And that's one of the things that's important to note is that the Fish and Wildlife Service knew that there are lots of extension specialists out there. They know that opinions may vary. They didn't make this hyper technical. They didn't restrict it. They used the broadest term possible, which was extension specialist of the whole Cooperative Endeavor Service of the USDA. And I think that's what they were trying to avoid. They didn't want a hyper technical, hyper legal analysis. They said generally if it's in accord with a recommendation, it's within this window that we're okay with it. And that was part of the background. There was a lot of cases that had conflict over subjective intent, what you need to do. And I think they were resolving this with the rule. One of the things they say at the bottom of the rule is we're trying to encourage landowners to open up their fields for use. So this amendment was a broadening of what was allowed, not a restriction. Remind me, are you making a lenity argument? We are, Your Honor. And that's really what we could fight over anything else. I don't think anybody can read this provision and say it unambiguously requires you follow only one office or only one specialist or any other way. You're referring to the language that defines what a normal agricultural operation is. Correct, Your Honor. When they say it's okay if it's pursuant to a normal agricultural operation, I don't think anybody can look at that and say, you know, I can read that and tell I need to go only to Baton Rouge. And that's really what I think is conclusive outside of everything else. But also the somewhat absurdity is they want to say, hey, it's okay if you do this, but if you follow 12-year-old recommendations from Baton Rouge, you're from a retired specialist, that's perfectly fine, your activity is normal. But if you follow recommendations that cover your particular crop and your particular area, you can't follow those because they're from three and a half hours away in Starkville. That's not really what they're intending. They're not saying you have to narrow this in. They're leaving that and saying, hey, agricultural experts, you make the recommendations, and by their face, like the Mississippi State one, we can tell if they apply. I believe I'm out of time. Thank you. Thank you, Counsel. You have time for rebuttal. Has arguing a case like this been in your past experience? This is my first bird case, Your Honor. May it please the Court, Forrest Phillips for the United States. This Court should affirm Mr. Holtman's convictions for at least three reasons. First, the Louisiana Extension Service guidance is the only applicable Extension Service guidance in this case, the state where Mr. Holtman's farm was. Also, Mr. Holtman loses even under the guidance of the state that he's picked, Mississippi. And also, as you pointed out, Judge Wiener, the common sense reason that this was not solely in furtherance of a normal agricultural operation because of all these things in the field, this power line with no purpose, this more densely scattered seed area underneath that power line that remove it from that context. I have a neatly organized presentation. Why don't you address something that Judge Duncan raised with your friend on the other side that's potentially overlapping guidance here, that the Mississippi State Extension Service guidance, in fact, can be interpreted to cover a much broader area than just Mississippi. Yes, Your Honor. Well, that goes to the first point here that Louisiana is the only applicable guidance no matter what this document from Mississippi says. The regulations, when they say that a normal agricultural operation is one conducted pursuant to the official recommendations of state extension specialists, state extension specialist is a term that goes back over 100 years. And from its creation, it is something that is definitionally state-specific. Congress said we've created this new entity, the USDA, and states pick what university you want your state extension service to operate out of. That service is going to provide recommendations to your state or region within your state to help further agricultural pursuits. And more recently than that, we've got some discussion about how broad these state extension services should be considered to cover. And that comes from the Fish and Wildlife guidance that Mr. Holdman offered into the record here as an exhibit. This is 504-505 of the Record on Appeal. That guidance contemplates, again this is Fish and Wildlife guidance, sub-regulatory guidance, an explainer for hunters. It contemplates what to do when your state does not have official recommendations for, say, a food plot plant. And it says in states where you don't have recommendations for a food plot plant, the seed should be planted in accordance with the extension service guidelines for producing a crop. It doesn't say in states where you don't have recommendations, go find a state that does. Am I wrong to believe that this, if this had happened in Mississippi, it would have been with the same result? You're absolutely correct, Your Honor, and for multiple reasons. For the reason that the district court judge articulates in his final opinion about this solely language and how, you know, independent from this really technical dispute about guidance, this is not a normal agricultural operation. But also because the Mississippi guidance, taken in total, also prohibits this. Now, opposing counsel is correct. That full document is not in the record on appeal. We link to it. But it's absurd to think this one-page explainer is everything that Mississippi has said about how to plant food plots. It has no information about soil coverage for any of these. I think it's 40, 50 crops it identifies, including some that are going to start underground categorically. Soybeans, winter peas, stuff like that. This is clearly a one-page explainer they've put out there that's been seized upon, as you pointed out, Judge Southwick, after the fact. Now, there is nothing in this record that suggests Mr. Holdman's trying his best to check all the boxes, complete his agricultural operation in accordance with this Mississippi guidance. Remember, when Mr. Holdman is approached by fish and wildlife agents in the field, and, you know, to a lesser extent on the stand in court, when he testifies, he says, I don't follow the normal way to plant stuff. I've got my own special operation, and I grow it in a special, unique way that myself and some others in my niche industry have figured out. And it's not what the experts are going to tell you to do. There is that feature of this case that the defendant does have an extraordinary operation raising these whatever, not exactly domesticated deer, but anyway, not wild deer. And as far as the record shows, what he explains as how he manages that would be correct. And I don't know how consistent his operation for the feed for this deer, how consistent that is with what we're talking about in this particular case, which we're saying violates the Extension Service guidelines. Yes, it's inconsistent. Help me with that. How does his specific business overlap with and potentially, because of its nature, ends up being inconsistent with the guidance? It's inconsistent with the guidance. And as far as how it overlaps, prior to this new guidance that came out in 1999, there was a more complicated test supplemented by courts about, well, is this something that farmers in the area might normally do? And the Fish and Wildlife Service said, we're done with that, it's too subjective. You've heard these words, subjective and objective, throughout this case. We're going to set a rule where you've got to follow Extension Service guidance. And he simply hasn't in this case. And to be clear, Judge Southwick, nothing prevents Mr. Holdman from growing his farm as he sees fit for his deer. He just can't hunt over this freshly thrown seed. And I want to point out something else from the Fish and Wildlife explainer. Again, this is sort of sub-regulatory guidance, but Mr. Holdman's entered the record and begged the court at every step to consider it. I don't know how much clearer Fish and Wildlife can be. Seeds freshly planted or otherwise distributed for the purpose of luring, attracting, or enticing doves within gun range will be considered baiting. To avoid any question, planning of wildlife food plots should occur early enough to allow time for the seeds to germinate. Well, if this were not baiting, why wasn't the seed covered? And why was it so much in just in this one area so excessively sown? Absolutely, Your Honor. I want to talk about that right now. This kind of goes to that third point in the district court opinion about how, hey, whatever's going on here, it's not solely in furtherance of a normal agricultural operation, even without getting into the weeds of the Extinction Service recommendations. And that is because when the district court assesses this, it sees several things that have no agricultural purpose whatsoever. Whether they're subjective in Mr. Holdman's mind or objective, is this something the guidance recommends? And that's this increased seeding rate under this power line, seeded more densely. At no point does any guidance anywhere suggest you to, you know, in the part of the field with your power line, you should seed more densely. It doesn't suggest a power line at all. The only purpose for this artificial improvement is to attract doves. And I think the district court understands that, and it says, we've got a big field here. Let's zoom in on the part where the baiting's occurring, and it's got every single indication, none of which are coupled to any recognizable agricultural operation purpose, practice, at all. And as far as the idea that intent, that the purpose of something has no bearing when it comes to this definition, the definition is objective, but it's also written text on a page. Normal agricultural operation means a normal agricultural planting, harvesting, post-harvest manipulation, or agricultural practice conducted pursuant to the official recommendations. Now, the bulk of that definition, normal planting, harvesting, or post-harvest manipulation is defined in the very next subsection up. I'm talking about 20.11 here. And it explicitly defines normal agricultural planting, harvesting, or post-harvest manipulation as one undertaken for the purpose of producing or gathering a crop. So we can quibble about whether this is an objective, can you identify an objective purpose, how this leads toward producing a crop, or whether Mr. Holdman's mind when doing it was to produce a crop, but at the end of the day, this power line has no purpose at all except to attract doves. This increased seeding rate has no purpose at all except to attract doves. And the evidence here is overwhelming to support that district court conclusion in its written opinion affirming its convictions on the first level of appeal that this specific area of the field, that's just baiting. I want to be clear here that under Mr. Holdman's version, someone can set out for the sole and explicit purpose of attracting a wildlife, be it scattering corn for deer, scattering wheat seeds for doves, and as long as they check enough magic boxes on any guidance they find anywhere in the country, with this self, this odd limiting principle that that state's got to say, it also applies in Louisiana. That doesn't make sense. That's not a limiting principle. What would prevent New Hampshire from saying, this also applies in Louisiana? You cannot limit this alternative argument to under any rational basis. And that in itself is part of the reason why the way this should be interpreted, this guidance, is that it only covers, when it says the official recommendations of a state extension service specialist, it's talking about your state. Otherwise you'd have this absurd sort of potential for one state to say, well we actually, we cover the five states around us. And then another state to say, well we do too and ours are different. That's what you have in this case. You have Louisiana guidance that says A, that Mr. Holdman concedes he did not follow, and then Mississippi guidance, a limited subsect of it, not the entire guidance, as we pointed out in our appellate brief, that says something else. And again... The record here show the distance in which this excessive amount of seed, uncovered seed, was beyond the shotgun range of the blind in which they were hunting. What you've got, Your Honor, is an aerial photo showing the scope of the entire operation as well as testimony at trial that, from the wildlife agents, I believe it was Agent Hatton, that the area around this artificial telephone line, around this hunting blind, that again had chairs in it, shotgun shells, dove decoys, that that was seeded even more densely than the other areas of the field. Now the exact pounds per square inch, pounds per square acre, you're not going to find that, the increased amount, but we do have in the record, unrefuted, the seeding rate is increased under this artificial telephone line. There's no purpose in farming for that. There's a purpose for tracking doves. And... But there's nothing in the record about how far it goes beyond shotgun range. The only thing in the record is that it becomes more dense when you get underneath the telephone line, underneath the artificial telephone line. Again, this weird difference in seeding rate that has no agricultural purpose, full stop. As the Court said, the only thing it can be doing is aiming to attract doves underneath this power line. And I do want to point out to the extent the Court is interested in this idea that the entire Mississippi Guidance, he's violated that as well, this was not published after Mr. Holman's offense conduct. Now, again, that's not in the record, unfortunately, but when Appellant's Reply Group has filed and said, hey, this didn't exist until after the offense conduct, I wanted to confirm that it wasn't and, you know, the Internet shows that it's not. It very much existed at the time of this. As far as I can tell, this date that he's pulled is when they reposted it to their site in 2019 with POD publication on demand 3-2-19. You can use the Wayback Machine or other things to find the exact same guidance with a date that precedes Mr. Holman's conduct. So this full guidance very much existed at the time, but again, Judge South, to kind of come back to your point, he wasn't looking for any of this stuff. He wasn't following any of this stuff at the time. This is an after-the-fact defense that's been created when Mr. Holman was open, even on the stand, that he's not following guidance. He's got his own unique way to grow a seed. And as far as Louisiana guidance being the only guidance that should cover here, we do have in the record Dr. Reed being questioned about that. Now, this is the expert that Appellate Counsel said we should defer to when it comes to what is state-assessing special-service guidance. And he says when asked on direct and then again on cross, this is 304, 305 in the record on appeal, and then the cross section kind of starts around page 340, that's irrelevant because that's not the state of Louisiana. You can tell it even takes him a certain amount of time to realize what's going on here because he couldn't conceive of the fact that someone would say, I've got this guidance from another state that applies. And as far as I can tell, Your Honor, searching, you know, these bird cases as they've made their way to circuit courts across the country the last 20, 30 years, there's never been a court, a district court even, for that matter, that said, yeah, use the guidance from another state. You can do that. This is a brand new position that has no support for any of the reasons we talked about, that these are definitionally state-specific entities from their creation, and every other statutory tool, this goes to your rule of lenity question, Judge, advocates for this being state-specific. The Fish and Wildlife Guidance says multiple times, in states where you don't have guidance for this crop, use the closest guidance in your state. It says in the formal commentary published to the Federal Register, these recommendations are going to vary from state to state or region to region within a state. They might even be site-specific. How would that work? If you had a state entity who has zero offices, the Extension Service, in Louisiana or in Alabama or in Tennessee, and say, Mississippi, I'd like you to come out here and assess this field and tell me if it's planted in accordance with your normal Extension Service recommendations, they couldn't do it because, again, these are state-specific entities. It just... You said something, a question I was going to ask but probably wouldn't have gotten around to. How would we know what you just said? That some states have guidance that is...multiple guidance may be covering different parts. Texas is fairly large. California, north and south, fairly good distance with different climate... What are you basing that on? How do we know that? Well, I'm basing it on the commentary in the Federal Register. Fish and Wildlife says these state Extension Services have guidance that may vary from state to state or region to region within that...One Extension Service sending out regionally limited guidance. So there's just one Extension Service for each state? Yes. This goes back to how they're created, right? They are created by Congress saying we've got this new agency, the USDA, we want each state to designate a state Extension Service, a cooperative Extension Service, is the language you're going to find in the statute, to be formally recognized by USDA to receive funding from USDA for the purpose of furthering agricultural pursuits in that state. So definitionally...Oh, and they're going to be run out of public land grant colleges. That aspect of cooperative Extension Services hold to this day. Louisiana is out of LSU. Mississippi is out of MSU. Texas is out of Texas A&M. And the states themselves, I think it's important to note, they're relying on their own guidance when they're offering explainers to hunters that want to make sure that they're not baiting, make sure that they've taken the proper precautions. And they're not saying, I linked to one from Texas's, you can find them for any state, they're not saying there are many of these, some states cover multiple states, go out there and find one that works for you. When they define what is considered a normal agricultural operation, thus not baiting, they're using their own state's guidance. And like I said, to do something differently creates an absurd result where the only limiting principle would be what each state says. This guidance applies only to these five states. Mississippi says that. Next door Louisiana might say, no, ours apply to ten states, including Mississippi. It's just not workable, and it contradicts every step, the statutory context, and again, this is sort of an oversimplified plain language argument you've got from the appellate side, because we're not dealing with the definition of state. We're dealing with what a state extension specialist is. That's capitalized in the guidance. That's a term of art. And so, you know, this floating definition of state is frankly irrelevant in this case. And every single more convincing interpretive tool that we have says, no, it's the state that you're in. And again, that includes the only record discussion we have of this with Dr. Reed. So I want to sort of end here by touching on all these three things again in quick succession. Louisiana guidance is the only guidance that applies when you look at the statute in context. Every interpretive tool we have, from the comments in Fish and Wildlife, the history under which this thing came about, the subrogatory guidance that Mr. Holdman has begged the court at every turn to look at and consider, magistrate judge on up, and common sense. You'd reach an absurd result if you let states define their own bounds of their state extension specialist. And that defeats the rule of linearity, too. You have all these statutory tools of interpretation advocating against it. Rule of linearity only applies if you've got a grievous ambiguity after using all of those tools. But Mr. Holdman loses even under his own state of choice, Mississippi, because again, the complete guidance, which the magistrate judge and district court understood this was not a complete chart, right? You have both of them saying district court judge expressly Mississippi does not contemplate leaving seed uncovered. That doesn't make sense. And finally, Judge Wiener, to your point, just the common sense position that the district court judge seized on, too, aspects of this field have no agricultural purpose whatsoever. Be it the seed scatter rate, how it varies as you get closer to that artificial telephone line, the fact that there's an artificial telephone line there at all, and again, I think it's been slightly overstated to the extent that you consider the purpose of that power line because the definition of normal agricultural operation includes that normal agricultural planting harvesting post-harvest manipulation language, which expressly contemplates the purpose of the thing that you're doing. And that can be objective or subjective, but either way he loses. That's the thing here. Mr. Holdman loses if it's an objective standard, he loses if you consider what's in his head. So, I mean, it's many ways to reach an affirmance in this case. All of them, I think, pretty simple. And with that, I guess the Court has questions. I'll rest. I have one question. Yes, Your Honor. And I think it was answered before. If this had occurred in Mississippi, would the result be any different? It would not be any different, Your Honor, and that's because both the complete extension service guidance in Mississippi would say this is not a way to plant a field, and also because you'd have these artificial improvements that have no agricultural purpose whatsoever. You'd have this key seed scattering rate variance, as you said, when you get under the power line, that has no difference whatsoever. It would be baiting. Again, Fish and Wildlife guidance said explicitly freshly thrown seed, that's going to be baiting. So with that, I'll rest. Your Honor, I want to start by pointing out the obvious. Nowhere today in oral argument or in the brief did the judge make any recommendations that was put into evidence and identify a single thing on that list that Mr. Holman's planning did not consist with. We can argue over the legal issue of whether or not how we define that term, but there's no factual argument that his planning was not in exact accord with that. And I do want to clarify, Judge Wiener, your reference to excessive seed rate. It was stipulated by the government that that seed rate was across the whole field. They had GPS locations, but it was within the parameters of the seed rate there. This argument now that the Fish and Wildlife Service requires it to have a agricultural exclusive purpose for non- waterfowl is the exact opposite of what the government told the District Court and what the guidance says. Let me quote page 115 from the record. This is the government's brief to the District Court. This is a purely objective standard. If it is spread in accord with an extension recommendation, it's not considered baiting regardless of whether it was intended to attract migratory birds for hunting. That's what the government said, the exact opposite of what you just heard. That's exactly what they say in their interpretation of hunting and baiting. The service recognizes wildlife food plots have no agricultural purpose other than hunting and wildlife. As normal agricultural operations provide, they are planted in accordance with cooperative extension service recommendations. The government says that completely clear. You can plant it solely for hunting if you follow the extension service recommendations. That's why the recommendations the government said to use that they put into evidence from LSU, they weren't for growing a crop. They were for wildlife food plots. They say in there you don't have to be a farmer. You don't have to intend to harvest it. To come in here and say, yeah, it needs to be an exclusively agricultural purpose is changing what they said below and changing what the law very clearly said. They were right the first time they said that. I've got some caution I would have to urge the court to do when we start talking about, this is common sense. Of course it was baiting. It's common sense that he did this thing or that thing. Injecting what we say about the outcome, common sense, when it varies from the text of a statute of regulation is obviously a very specific term. The court just heard on Bonk an issued opinion a few years ago in Cargill on machine guns. We say it's common sense what you're doing here, but no, we don't say what's the outcome is common sense. Let's look at the term. You've got a real textualism problem if you start moving, well, obviously this guy wants to hunt so he's guilty of baiting. Let's overlook what the statute says very specifically. The idea that state extension specialist is a term of art and we don't need to worry about how the regulations define state, well, it's not. This regulation went to great detail. They defined 50 terms from the basic of what is a fish, what is wildlife down to filleting the difference between normal planting and practice. They didn't define that term. They didn't define state extension specialist. The only word in that phrase, they don't take issue with extension specialist or U.S. Department of Agriculture. The one word they want to argue about is state and it's specifically defined and the regulations say it shall have this meaning throughout the regulation. Now, one comment was, hey, what if there's different overlapping regulations and recommendations? That was anticipated that they would be different. We know that. There's an extension office in Baton Rouge. There's one in Alexandria. You can go get an oral recommendation. They may be different. The policy, the agency was not concerned with just one thing. They could have restricted it if they wanted to. They didn't. The idea is generally objectively, take a recommendation if it's within that, you've satisfied the requirement. Thank you. Thanks to both of you for bringing your arguments to us today. I take this case under advisement.